Affirmed and Opinion filed April 12, 2011.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-09-01040-CR

___________________

 

Herbert Ray Wilson, Appellant

 

V.

 

THE State of Texas, Appellee



 



 

On
Appeal from the 174th District Court

Harris County,
Texas



Trial Court Cause No. 1133069

 



 

 

OPINION

Appellant,
Herbert Ray Wilson, was convicted of capital murder and sentenced to life in
prison without the possibility of parole.  He appeals four points of error on
this appeal.  We affirm.  

FACTUAL AND PROCEDURAL BACKGROUND

On the night of September 11, 2007, appellant and
several of his friends visited Tierra Humphries’ apartment.  Humphries stated
her female friends Kerri Hubbard and Alli’e Babers were also present.  Hubbard
testified the men exited and entered the apartment several times that evening, but
during the evening she saw appellant robbing cars in the parking lot.  Eventually,
Hubbard explained, appellant and two of his friends, Eric Young and Eldrick
Telefore, departed the apartment together.  Hubbard testified she later heard a
gunshot and saw all three men running to Humphries’ apartment.  She testified
that Young and Telefore held nothing in their hands upon their return, but
appellant carried a crowbar, gun, and computer monitor.  Hubbard testified that
Young and Telefore appeared frightened, but appellant appeared angry.  She
further stated that appellant told her that if “y’all say anything, then I’m
going to kill y’all . . .” 

Kelvin Parker testified he was outside the apartment
he shared with his pregnant girlfriend, Anternett Thomas, that evening.  Parker
stated he noticed that the dome light in Thomas’ car was on, so he decided to investigate. 
Upon approaching the vehicle, he realized the radio had been removed.  Then Parker
noticed a “black male” putting items in the back of a truck he knew was owned
by Hispanic individuals.  Parker confronted the man, who had “some kind of
bandana” wrapped around his hand.  Parker explained this gesture signaled the
man intended to fight.  Parker witnessed the man walking towards Humphries’
apartment.  

Parker stated he then returned home, got his car
keys, told Thomas to lock the doors, and left the apartment complex in Thomas’
car to collect his friend, Terryl Senegal.  He decided Senegal should be
present because he wanted someone to “fight with me if it came down to that.” 
Upon returning, Parker explained he and Senegal went to Parker’s apartment. 
Parker stated that upon entry, they found Parker’s computer on the floor with
the monitor missing.  Senegal articulated that Parker looked for Thomas, but
could not locate her until Parker discovered the bathroom door was blocked and
requested Senegal’s help to open it.  Senegal stated he pushed the door,
eventually opening it enough to see blood and Thomas’ body on the floor.  

Dr. Morna Gonsoulin, assistant medical examiner for
Harris County, testified Thomas died of a gunshot to the head.  Dr. Gonsoulin explained
the gun was probably less than six inches from Thomas’ head when the bullet was
fired.  Neither Thomas nor her fetus survived.  

Officer Richard Martinez of the Houston Police
Department testified that based upon statements and photo identification of
appellant by Humphries, Hubbard and Baber, he arrested appellant the day after
Thomas’ death.  Officer Martinez stated he initially handled the statement of
another individual involved in the case while Officer Curtis Scales interviewed
appellant.  According to Officer Martinez, after he finished with the other
person, he joined Officer Scales and participated in appellant’s interview. 
Appellant confessed to robbing the cars, but did not confess to Thomas’ killing
at that time.    

The following day, Sergeant Brian Harris interviewed
appellant at the request of Officers Martinez and Scales.  Sergeant Harris gave
Miranda[1]
warnings to appellant at the start of the interrogation.  Appellant waived his
Miranda rights.  The transcript of the interview shows, Sergeant Harris had two
primary discussion points that he returned to throughout the throughout the
interrogation:

(1)   The difference between
justice and mercy.  Sergeant Harris defined justice as “getting what [you]
deserve” and mercy as “giving what people need.”  Sergeant Harris also
suggested that appellant may have been afraid of Parker and had no intention of
killing anyone when appellant shot the gun.  In a variation on the theme,
Sergeant Harris stated that appellant needed to “be real” and “be a man” by
taking responsibility for his actions.  

(2)  The stress a trial would
cause appellant’s mother.  Sergeant Harris then discussed how appellant might
be portrayed in the press as a “monster,” the effects on the mother of having
to sit through a trial, and the possibility appellant’s mother might “mortgage”
everything she owned to try to help her son.

Initially maintaining his innocence, appellant later confessed
to killing Thomas.  During the course of follow-up questions, he also admitted
taking Parker’s computer monitor from the apartment when he fled.  

Appellant was charged and convicted of capital
murder.  See Tex. Penal Code Ann. § 19.03(a)(1) (West 2010).  He was
seventeen years old at the time of the killing, so he was not eligible to
receive the death penalty.  Roper v. Simmons, 543 U.S. 551, 575 (2005). 
Upon conviction for capital murder, he received an automatic life sentence
without the possibility of parole.  Tex. Penal Code Ann. § 12.31(b)(2).  

I.                  
 Appellant’s Confession to Thomas’ Killing Was Voluntary, so the
Trial Court Did Not Err in Allowing the Jury to View the Confession.

Appellant argues his confession was involuntary because
Sergeant Harris implied he would receive a lesser sentence in exchange for
confessing, and manipulated appellant’s emotions to gain a confession.

A.     Standard
of Review

Voluntariness of a confession is a mixed question of
law and fact.  Garcia v. State, 15 S.W.3d 533, 535 (Tex. Crim. App.
2000).  We review the trial court’s ruling on a motion to suppress under a
bifurcated standard of review.  Carmouche v. State, 10 S.W.3d 323, 327
(Tex. Crim. App. 2000).  We give almost total deference to the trial court’s
determination of facts while we review the issues of law de novo.  Id.  We
review the totality of the circumstances to determine voluntariness.  Lane
v. State, 933 S.W.2d 504, 512 (Tex. Crim. App. 1996).

B.      Analysis

Appellant argues that Sergeant Harris committed
constitutional “overreaching” that created an involuntary confession.  See Colorado
v. Connelly, 479 U.S. 157, 163-64.  A confession is involuntary if the
totality of the circumstances indicates that the defendant’s will was
“overborne” by police coercion.  Creager v. State, 952 S.W.2d 852, 856
(Tex. Crim. App. 1997).  Appellant argues his confession was involuntary for two
primary reasons:  

(1) Sergeant Harris implied appellant would receive
lesser punishment for confessing.  This included offering to “paint a different
picture for the District Attorney” of the crime, something appellant claims a
grown man might have understood meant little, but appellant could not be
expected to know.  Appellant also argues it would be “inconceivable” that
Sergeant Harris was unaware an automatic sentence of life without parole would
be imposed if appellant was convicted after he confessed to the crime.  Thus,
appellant argues, the conversation about mercy was, in effect, a lie told by
Sergeant Harris.  

(2)  Appellant also argues that Sergeant Harris’
discussion of his mother spending her money on his defense was inconsistent
with the Miranda warning that appellant could receive appointed counsel, thus
helping make appellant’s confession involuntary.

Both Sergeant Harris and appellant testified at the
suppression hearing held by the trial court.  The trial court also had the
opportunity to view the recording of the confession.  Thus, the trial court had
requisite knowledge to make factual determinations. 

1.       Justice
and Mercy Discussion 

A confession is rendered inadmissible due to improper
inducements if there is (1) a promise of some benefit to the accused; (2) that
is positive; (3) made or sanctioned by someone in authority; (4) and that it is
of such an influential nature that it would cause a defendant to speak
untruthfully.  Martinez v. State, 194 S.W.3d 656, 660 (Tex. Crim. App.
2004). 

We begin by noting this court does not have any
evidence in the record about whether Sergeant Harris believed appellant would
be charged with capital murder.  A police officer may know the elements of
capital murder and other chargeable homicide offenses, but does not make the
ultimate determination on charging a defendant.  See Tex. Penal Code
Ann. § 19 (West 2010); Tex. Code Crim. P. Ann. § 20.03, 20.20-21, 21.21.  We
also find no evidence Sergeant Harris had proof prior to the confession that
appellant committed capital murder instead of a lesser homicide offense.

Sergeant Harris testified during the suppression
hearing that his use of the themes justice and mercy did not imply that a deal
was possible. Sergeant Harris stated appellant acknowledged this fact when he placed
phone calls and stated he would be going to prison “for a minute.”  Sergeant
Harris explained “for a minute” was slang for “a long time.”  In addition,
Sergeant Harris informed appellant that he stated he would speak to the
District Attorney, but never promised any deal for the defendant.  In contrast,
appellant testified that, “Sergeant Harris told me if I told him what he wanted
to hear, that he would talk to the D.A. about letting me go home.”  

The recorded interrogation confirms that the
conversation began with a general discussion regarding the meaning of justice
and mercy.  Sergeant Harris defined justice as “getting what [one] deserves,”
even if that is a severe punishment.  However, Sergeant Harris opined, “[W]e
don’t live in a society of justice because if I got  . . . everything that I
deserved for the things [that] I’ve done . . . this would be a hard place to
live.”    He contrasted justice with mercy, which he defined as “getting what
you need,” or leniency and forgiveness.  

Sergeant Harris then posited some theories of the
murder which would have made appellant less culpable and discussed the effect a
trial would have on appellant’s mother.  Sergeant Harris also informed
appellant that other police officers believed he was a “cold-hearted bastard
that you had no feelings . . . and that you . . . at some point said just go
[a]head [and] give me the needle and that’s a bunch of garbage man.”  Sergeant
Harris remarked, “You got to explain something . . . It’s the right . . . thing
to do . . . then I can call the district attorney and say hey this is what
really happened this guy didn’t mean for this stuff to go on.  Do you
understand, there’s consequences regardless for your actions . . . but its
either you’re gonna be looked at with the eyes of justice, this guy deserves
the worst . . . or the eyes of mercy . . . Herbert is not that evil monster
that he is painted to be.”

Appellant argues these statements were improper
inducements because there was a promise of “mercy” if he confessed, which was
impossible because he confronted an automatic sentence of life without the
possibility of parole.  Assuming arguendo that appellant proved the
first three elements of the test of improper inducements, we conclude appellant
cannot demonstrate the fourth element.  Martinez, 194 S.W.3d at 660.  The
statements about justice and mercy would be unlikely to induce an innocent
person to confess to murder.  If justice is “getting what [you] deserve,” an
innocent person would probably continue to plead his innocence.  Furthermore, the
promise to “call the district attorney and say . . . what really happened” does
not create an involuntary confession.  Herrera v. State, 194 S.W.3d 656,
660 (Tex. App.—Houston [14th Dist.] 2006, pet ref’d) (statement “We can talk to
the D.A., get you an offer, if you can help us” did not induce an involuntary
confession).  We overrule appellant’s objection on this point.

2.       Discussion
of Appellant’s Mother Using Her Money to Assist in Appellant’s Defense

Appellant also argues that Sergeant Harris induced an
involuntary confession with his statement, “[Y]ou’re gonna say that you’re an
innocent person and your momma’s gonna spend all kinds of money to try to help
you out and [if she] own[s] a house [or] car she’s gonna put all that up for
mortgage . . . and she’s gonna say we’ll do all this[,] we’re gonna fight for him
. . . [I]t’s gonna destroy her[.]  [S]he will lose everything.”    Appellant contends
these discussion points directly oppose appellant’s right to receive appointed
counsel, which helped make the confession involuntary.  

Police officers are permitted to suggest that
suspects decline legal counsel to “save himself or his family the expense”
despite the constitutional requirement that suspects be informed that they have
a right to appointed counsel.  Miranda v. Arizona, 384 U.S 436, 454
(U.S. 1966).  Thus, we cannot say as a matter of law that all discussion about
the expense of legal representation is so contrary to the right to appointed
counsel that it creates involuntary confessions.  Nonetheless, police
discussion of economic hardship might form enough pressure to overcome some
defendants’ will and create involuntary confessions.  See Creager, 952
S.W.2d at 856.  Consequently, the inquiry into whether such statements by the
police overcame the will of the defendant requires a factual determination.  See
id.  As an appellate court, we give almost total deference to a trial
court’s rulings on fact issues regarding confessions.  Carmouche, 10
S.W.3d at 327.  The trial court in appellant’s case heard the evidence and
concluded that the confession was voluntary.  We decline to overrule the trial
court’s factual determination, and therefore determine the conversation about
appellant’s mother did not create an involuntary confession.

Appellant’s first point of error is overruled.

II.              
 An Automatic Sentence of Life Without Parole Is Constitutional
Under the Eighth Amendment to the U.S. Constitution.

Appellant argues his sentence of automatic life
without the possibility of parole upon conviction was cruel and unusual
punishment because he was a juvenile at the time of Thomas’ killing.  He argues
the Eighth Amendment to the U.S. Constitution requires a jury consider
mitigating circumstances and reduce his sentence.  

The Eighth Amendment prohibits “cruel and unusual
punishment” for crimes.  U.S. Const.
amend. VIII.  This requirement is applicable to the states through the due
process clause of the Fourteenth Amendment.  Robinson v. California, 370
U.S. 660, 666-67 (1962).  The U.S. Supreme Court has determined that juveniles
may never receive the death penalty for any crime because that sentence
violates the Eighth Amendment.  Roper v. Simmons, 543 U.S. 551, 575
(2005).  Most recently, the U.S. Supreme Court has also determined that
juveniles convicted of non-homicide crimes may not be sentenced to life imprisonment
without the possibility of parole.  Graham v. Florida, 130 S.Ct. 2011,
2034 (2010).  

Using the analysis found in death penalty cases and Graham,
appellant asks us to extend the law and find that the Texas statute creating an
automatic sentence of life without the possibility of parole for juveniles is
unconstitutional.  Appellant provided a well-researched, cogent brief on this
point for our consideration.  

After the submission of appellant’s brief, however,
the Texas Court of Criminal Appeals considered this issue.  Meadoux v.
State, 325 S.W.3d 189 (Tex. Crim. App. 2010).  In that case, the defendant
was a juvenile convicted of capital murder and sentenced to life imprisonment
without the possibility of parole, just as appellant is.  Id. at 192. 
The Court of Criminal Appeals stated that when faced with a challenge like
appellant’s, we “must consider: (1) whether there is a national consensus
against imposing the punishment for the offense; (2) the moral culpability of
the offenders at issue in light of their crimes and characteristics; (3) the
severity of the punishment; and (4) whether the punishment serves legitimate
penological goals.”  Id. at 194.  Furthermore, it is the appellant’s
burden to show these factors.  Id., n. 7.  

A.     National
Consensus

Appellant provided no evidence of a national
consensus against an imposition of life imprisonment without the possibility
parole.  

B.      Moral
Culpability

Appellant argues that his confession “indicated that
the appellant did not know that he was shooting a woman, let alone a pregnant
woman, when he got the gun around the door edge and fired into a person just
inches away inside the bathroom.”  Appellant contends that “viewed in terms of
what the appellant set out to do and thought he was doing at the fatal moment,
this was not the worst conduct in the pantheon of capital murders.”  Appellant
also asks this court to consider mitigating factors not found in the appellate record
in our analysis, including appellant’s failure in school, and possible lack of
parental love and supervision.  In addition, appellant pleads, in essence, that
he was peer pressured by his male friends into the burglaries of the car and
Thomas’ home after the women in Humphries’ apartment showed no interest in
sexual activity with them.  Appellant also argues there is some indication that
he may have associated with gang, which might have had an impact on appellant’s
decisions.  

Nonetheless, we must consider appellant’s own conduct. 
After a confrontation with Parker, appellant did not decide to leave the
apartment complex, or even retreat and remain in Humphries’ apartment. Parker
left the apartment complex to retrieve Senegal; appellant could have chosen
either action without danger to himself.  Furthermore, according to his own
confession, he made a conscious choice to enter Parker and Thomas’ apartment
and shoot the person in the bathroom without even confirming who he was firing
at.  Finally, he made a decision to take the computer monitor with him when he exited
the apartment.  

Our judicial system recognizes a fundamental difference
between homicide and other violent offenses.  Graham, 130 S.Ct. at
2027.  Homicide ends the life of the victim, and thus cannot be compared in its
severity to crimes in which the victims live.  Id.  As a result, even
serious violent crimes are different from homicide “in a moral sense.”  Id. 
Therefore, whatever reduced moral culpability exists because of appellant’s age
or circumstances, the moral responsibility is still greater than is present for
any other offenses.  Meadoux, 325 S.W.3d at 195.  

C.     Severity
of Punishment

The third factor is severity of punishment.  It is
undeniable that life imprisonment without possibility of parole is a severe
punishment, second only to execution.  Graham, 130 S.Ct. at 2027.  

D.     Goal of
Punishment

The fourth factor is the goal of the punishment.  Meadoux,
325 S.W.3d at 194.  The Court of Criminal Appeals has adopted Graham’s
analysis in discussing the four goals of penal sanction:  deterrence,
incapacitation, rehabilitation, and retribution.  Id. at 195.  If the
sentence lacks penal justifications, it is disproportionate to the offense and
therefore unconstitutional.  Graham, 130 S.Ct. at 2028.  We consider
each purpose in light of the Court of Criminal Appeals’ ruling in Meadoux. 
325 S.W.3d at 195.

1.       Deterrence
of Others

Graham stated that juveniles are less
susceptible than adults to the deterrence motivation of punishment.  Graham,
130 S.Ct. at 2028.  Juveniles are less likely to consider consequences of
their actions, and thus are less influenced by the possibility of life
imprisonment without the possibility of parole.  Id.  Consequently, both
Graham and Meadoux agree, any deterrence justification can be
achieved by sentencing juveniles to life with the possibility of parole.  Graham,
130 S.Ct. at 2029; Meadoux, 325 S.W.3d at 195-96.  

2.       Incapacitation
of the Offender

The purpose of incapacitation of the offender is to
prohibit the offender from committing other crimes.  Graham, 130 S.Ct.
at 2029.  Preventing recidivism is an important goal in punishment.  Id. 
Appellant argues that while incapacitation works “in the short run,” the issue
we should consider is how long incapacitation is necessary.  Appellant argues
that there are empirical studies showing that “there is a marked decrease in
risk [of violent behavior] as a person becomes elderly.”  Although appellant
provides no citation for these empirical studies, we will assume that his assertion
is true.  

Graham’s prohibition on life without parole
for juveniles is limited to those juveniles who have not committed homicide;
there has been no constitutional error found for compulsory sentences of life
without parole for juveniles convicted of murder.  Graham, 110 S.Ct. at
2034.  The Legislature has the solemn responsibility to determine the
appropriate sentences for crimes unless a constitutional prohibition exists.  Meadoux,
325 S.W.3d at 196.  The Court of Criminal Appeals believes the Legislature
could reasonably believe that some offenders require life imprisonment without
the possibility of parole, including juveniles convicted of homicide.  Id. 
Appellant has committed capital murder, the most serious offense possible.  As
a result, we cannot conclude that the incapacitation of appellant for life is
disproportionate to the offense.  Id. at 195.

3.       Rehabilitation

Rehabilitation of convicts is one of the goals of the
penal system.  Graham, 110 S.Ct. at 2029.  Life without parole, however,
cannot be justified through the goal of rehabilitation because society has
determined the offender may never return to it.  Id. at 2030.

4.       Retribution

Appellant queries, “Does retribution really demand
that a person’s last breath be drawn in prison, perhaps sixty or seventy years
after the offense?”  (Ant. B. 34)  It is a challenging question, but we must
also remember that Thomas’ last breath occurred just before appellant shot
her.  She does not have another “sixty or seventy years.”  As discussed above, it
is the legislature’s duty to determine the appropriate sentence for an
offense.  Meadoux, 325 S.W.3d at 196.  The legislature must decide the
sentence that will “directly relate[] to the personal culpability of the
criminal offender.”  Tison v. Arizona, 481 U.S. 137, 149 (1987). 
Consequently, we conclude that it is within the legislature’s discretion to
choose whether retribution requires life imprisonment.  Meadoux, 325
S.W.3d at 196.  

E.      Conclusions

After weighing all the factors, we cannot conclude
appellant proved that an automatic sentence of life without possibility of
parole is unconstitutional.  Appellant has not provided any evidence of
national consensus.  Furthermore, although the sentence is severe, appellant
does have great moral culpability due to his actions.  Finally, although
appellant’s punishment cannot be justified on the basis of deterrence or
rehabilitation, the legislature could have determined that the goals of
incapacitation and retribution justify the automatic imposition of life without
parole.  We overrule appellant’s second issue.

III.           
An Automatic Sentence of Life Without the Possibility of Parole
Does Not Violate the Texas Constitution Because There Is No Right to Present
Mitigation Evidence in a Non-Death Penalty Case.

Appellant argues in his third point of error that an
automatic sentence of life without the possibility of parole violates the Texas
Constitution Article I, Section 13.  Tex.
Const. art. I, §13.   He correctly states that state constitutions can
provide additional protections for criminal defendants beyond those required by
the U.S. Constitution.  See Heitman v. State, 815 S.W.2d 681, 683 n.1
(Tex. Crim. App. 1991) (listing criminal protections under the Texas
Constitution that are greater than that afforded to criminal defendants under
the U.S. Constitution).  

The provision of the Texas Constitution at issue
reads, “Excessive bail shall not be required, nor excessive fines imposed, nor
cruel or unusual punishment inflicted.”  Tex.
Const. art. I, §13.  Appellant argues that the use of the word “or”
between cruel and unusual provides additional protections to the appellant. 
The Federal Constitution uses the phrase “cruel and unusual punishment,” and
appellant implies that a theoretical punishment could be cruel but not unusual
and be constitutional under federal but not Texas law.  U.S. Const. amend. VIII.  

Appellant contends “Most Texans would think it
‘cruel’ to deny a criminal defendant any chance to offer evidence of mitigating
evidence.”  Furthermore, he states, only two categories of convicted offenders
receive automatic sentences — capital offenders where the death penalty is
waived, and certain sex offenders.  Appellant provides no citations for these
assertions.

The U.S. Supreme Court previously refused to extend
the right to present mitigating evidence at death penalty sentencing to
non-death penalty cases.  Harmelin v. Michigan, 501 U.S. 957, 995 (1991)
(finding a sentence of life without parole is constitutional and the mandatory
nature of such sentence does not render it unconstitutional where the death
penalty is not at issue).  Our sister court concluded that the Texas Constitution
does not provide any additional rights to present mitigating evidence at
non-death penalty cases.  Cienfuegos v. State, 113 S.W.3d 481, 495 (Tex.
App.—Houston [1st Dist.] 2003, pet ref’d).  We adopted that holding in our
jurisprudence.  Bergara v. State, 2009 WL 2476513 (Tex. App.—Houston
[14th Dist.] 2009, pet. ref’d) (mem. op., not designated for publication).  

Although we acknowledge that neither the First Court
of Appeals nor our previous memorandum opinion is binding authority on us, we adopt
the analysis and conclusions here.  We conclude the Texas Constitution does not
provide a criminal defendant in a non-death penalty case any rights to present
mitigating evidence during the punishment phase.  Appellant’s third point of
error is overruled.

IV.            
 There is No Violation of the Texas Constitution Because
Automatic Sentences Do Not Usurp Executive Parole Officials’ Authority.

Appellant contends an automatic sentence of life
without parole violates the principle of separation of powers between the branches
of government.  Article II, Section 1 of the Texas Constitution requires a
separation of powers between the executive, legislative, and judicial
branches.  Tex. Const. art. I, §
13.  The Board of Pardons and Paroles is part of the executive branch.  Tex. Const. art. IV, § 11(a).  In
Texas, prosecutors are considered part of the judicial branch of government.  Meshell
v. State, 739 S.W.2d 246, 253, 257 (Tex. Crim. App. 1987).  

Appellant makes an argument he admits is novel.  He
contends that an automatic sentence allows the legislature to shift authority
from the executive branch (Board of Pardons and Paroles) to the judicial branch
(the prosecuting attorney).  The theory is as follows:  the legislature has
constitutional authority to make the laws.  By creating mandatory sentences,
the authority of the Parole Board has been inappropriately vested in the
prosecuting attorney because the prosecutor may now determine whether the
convict eligible for Board consideration.

In support of this proposition, appellant cites a
case discussing the Speedy Trial Act.  Meshell, 739 S.W.2d at 246.  The
State argued that the legislature’s law requiring the prosecutors to be ready
within 120 days after commencement of a criminal action against a defendant
violated prosecutors’ discretion, and thus violated the separation of powers.  Id.
at 250-51.  The Court of Criminal Appeals concluded that the Speedy Trial
Act unconstitutionally violated separation of powers because it violated
prosecutorial discretion.  Id. at 257.  

Appellant also cites a case in which the state’s
Attorney General (a member of the executive branch) asserted exclusive rights
to prosecute a case over a county attorney (a member of the judicial branch). Meshell,
739 S.W.2d at 253, 257; State v. Moore, 57 Tex. 307, 1882 WL 9501 at
*5 (Tex. 1882).  The Texas Supreme Court determined that the county attorney
had constitutional authority to prosecute any cases in his jurisdiction, and
the Attorney General’s claim was a violation of separation of powers.  Moore,
57 Tex. 307, 1882 WL 9501 at *6-8.

We construe appellant’s argument to either advocate:
(1) the abolishment of all automatic sentences to prevent legislative
usurpation of executive authority; or (2) a prohibition of prosecutors from
prosecuting any person under a statute that requires an automatic sentence.  We
conclude that the Legislature did not seize executive authority, so we disagree
with appellant’s argument.

Appellant has not offered any evidence that the Board
of Pardons and Paroles (“Board”) was designed to give the Board power over
every prisoner.  We conclude the Texas Constitution requires the Legislature to
create a Board, but there is no requirement that all prisoners receive
consideration for pardons or paroles.  Tex.
Const. art. IV, §11 (“The Legislature shall by law establish a Board of
Pardons and Paroles and shall require it to keep record of its actions and the
reasons for its actions.”).  Furthermore, we note that the Board retains some
authority over appellant because the Board also advises the Governor on
reprieves, commutations, and pardons.  Id. at § 11(b)  (“In all criminal
cases, except treason and impeachment, the Governor shall have the power, after
conviction, on the written signed recommendation and advice of the Board of
Pardons and Paroles . . . to grant reprieves and commutations of punishment and
pardons . . .”).

Furthermore, the prosecutor’s discretion to determine
which charge to bring and prosecute is broadly construed.  Bordenkircher v.
Hayes, 434 U.S. 357, 364 (1978),  Neal v. State, 150 S.W.3d 169, 173
(Tex. Crim. App. 2004).  Within the confines of the legislatively created
chargeable offense, the prosecutor may charge a defendant with any crime for
which the prosecutor has probable cause, provided the charge was not made based
upon an arbitrary classification, such as race.  Bordenkircher, 434 U.S.
at 364.  

To deprive the prosecutor of his/her discretion in
favor of ensuring the Board has authority to determine parole for all inmates would
shift power from the judiciary to the executive branch.  To do so without clear
constitutional mandate would result in an inappropriate exercise of this
court’s authority.  We decline appellant’s request for this court to intervene.
.  Appellant’s fourth point of error is overruled.

CONCLUSION

Having overruled each of appellant’s points of error,
we affirm the trial court judgment.

                                                                        

                                                                                    

                                                            /s/        John
S. Anderson

Justice

 

 

 

Panel consists of Justices Anderson,
Seymore, and McCally.

Publish
— Tex. R. App. P. 47.2(b).









[1] Miranda v. Arizona, 384
U.S. 436 (1966).